# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

QCX LLC, d/b/a Polymarket US,

<em>Plaintiff</em>,

v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; JORDAN MAYNARD, in his official capacity as Chair of the Massachusetts Gaming Commission; EILEEN O'BRIEN, in her official capacity as Commissioner of the Massachusetts Gaming Commission; BRADFORD R. HILL, in his official capacity as Commissioner of the Massachusetts Gaming Commission; NAKISHA SKINNER, in her official capacity as Commissioner of the Massachusetts Gaming Commission; PAUL BRODEUR, in his official capacity as Commissioner of the Massachusetts Gaming Commission; and DEAN SERPA, in his official capacity as the Executive Director of the Massachusetts Gaming Commission,

<em>Defendant</em>s.

Case No.:

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      This action seeks to prevent imminent and irreparable harm arising from Massachusetts's enforcement of state gambling laws against federally regulated derivatives exchanges—enforcement Congress has expressly prohibited.  Plaintiff QCX LLC, d/b/a Polymarket US, operates a lawful, nationwide designated contract market subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC").  Through the Commodity Exchange Act ("CEA"), Congress vested the CFTC with sole regulatory authority over event

contracts and other derivatives traded on designated contract markets, ensuring national uniformity and precluding precisely this kind of state interference.

2.      The threat to Polymarket US is immediate and concrete. On February 6, 2026, Massachusetts obtained a preliminary injunction against another CFTC-designated contract market, KalshiEX, on the theory that federally regulated event-contract trading constitutes gambling. *See Commonwealth of Massachusetts v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty.), Dkt. 1, 57. That injunction demonstrates the Commonwealth's willingness to use state law to shut down federally authorized markets despite clear federal preemption. Polymarket US now faces a real and imminent risk of identical enforcement, exposing it to civil penalties, potential criminal liability, forced cessation of operations within Massachusetts, and severe collateral consequences to its nationwide operations.

3.      The resulting harm would be irreparable. Even a meritless state enforcement action would immediately disrupt Polymarket US's federally authorized operations, fragment a national market, reduce liquidity, jeopardize critical banking and commercial relationships, undermine user trust, harm Massachusetts residents, and force Polymarket US to choose between exercising its federal right to operate nationwide or submitting to unlawful state coercion. Such disruption to a nationally uniform market cannot be remedied through damages. The chilling effect on lawful activity and the deprivation of Massachusetts residents' access to a federally regulated exchange is precisely the harm Congress sought to prevent.

4.      Any enforcement action by Massachusetts *would* be meritless. The CEA grants the CFTC exclusive jurisdiction over derivatives traded on designated contract markets and expressly preempts state laws attempting to regulate or prohibit such trading. In 1974, Congress amended the CEA to grant the CFTC "exclusive jurisdiction" over derivatives "traded or executed

2

on a contract market designated" under the Act. 7 U.S.C. § 2(a)(1)(A). Since then, Congress has repeatedly expanded the CFTC's exclusive authority to cover new derivatives—including event contracts—traded on federally regulated contract markets.

5.      The CFTC itself has repeatedly reaffirmed that designated contract markets and event contracts lie squarely within its exclusive jurisdiction, and that conflicting state enforcement actions undermine the public interest. On January 29, 2026, CFTC Chairman Michael S. Selig reiterated that "prediction markets" and "event contracts" "have operated within the CFTC's regulatory perimeter for more than two decades" and have played an "important role . . . in the broader financial system." He warned that state litigation against federally regulated markets injects uncertainty that "has not served our markets well" and harms "the public interest." He directed the CFTC to reassess its litigation posture in cases implicating jurisdictional boundaries, emphasizing that where "jurisdictional questions" arise, "the Commission has the expertise and responsibility to defend its exclusive jurisdiction over commodity derivatives."[1]

6.      The CFTC acted decisively in fulfilling that responsibility. On February 5, 2026, it sought leave to file an amicus brief in a Ninth Circuit appeal seeking to enjoin the State of Nevada's threatened enforcement action against another designated contract market, Crypto.com. *See N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 5, 2026), Dkt. 30. The CFTC explained that its support of the designated contract market was necessary to protect and defend its exclusive jurisdiction over federally regulated derivatives trading, reaffirming "the CEA's preemption of state laws attempting to regulate trading on CFTC-registered contract markets." *Id.* at 2.

---

[1] Remarks of Chairman Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1 ("*Unleashing Innovation*").

7.        Defendants suffer no cognizable harm from being barred from enforcing state gambling laws in a domain Congress explicitly removed from state control.  Massachusetts remains free to regulate, license, and tax gambling within the Commonwealth.  Any asserted local interests—such as consumer protection—are speculative as applied to federally regulated derivatives exchanges, and already governed and safeguarded by federal oversight.  By contrast, absent judicial intervention, Massachusetts's actions threaten to fracture a nationally uniform federal regulatory regime, disrupt lawful markets, burden interstate commerce, and deprive consumers of access to platforms Congress sought to protect.

8.        For these reasons, Polymarket US seeks declaratory and injunctive relief to prevent unlawful state overreach, preserve the integrity of the federal regulatory framework, and avert imminent harm that cannot be remedied after the fact.  Immediate judicial intervention is necessary to uphold Congress' mandate, protect the federal market structure, and safeguard the rights of users nationwide.

## JURISDICTION AND VENUE

9.        This is an action for declaratory and injunctive relief brought under the Supremacy Clause of the United States Constitution (including in reliance on this Court's equitable powers under *Ex parte Young*, 209 U.S. 123 (1908)).  Defendants are charged with enforcing the state laws at issue here.  This Court has jurisdiction to grant the relief sought in this action under 28 U.S.C. §§ 1331, 2201, and 2202.

10.        This Court has personal jurisdiction over the Defendants.  The Defendants are domiciled and perform their duties in Massachusetts.

11.        Venue is proper in this district under 28 U.S.C. § 1391(b).  All Defendants are residents of the Commonwealth of Massachusetts, and a substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

12.      Plaintiff Polymarket US is a Delaware limited liability company with its principal place of business in New York.  Polymarket US operates a derivatives exchange and prediction market where users can buy, sell, and exchange financial products known as event contracts.  Polymarket US is an exchange market that is federally licensed and regulated by the CFTC pursuant to the CEA.

13.      Defendant Andrea Joy Campbell is the Attorney General of the Commonwealth of Massachusetts.  This suit is brought against Attorney General Campbell in her official capacity. The Attorney General has authority to enforce the law under Mass. Gen. Laws ch. 23N, § 4(g) and Mass. Gen. Laws ch. 12, § 10 and has demonstrated a willingness to exercise that duty.

14.      Defendant Jordan Maynard is the Chair and Commissioner of the Massachusetts Gaming Commission.  This suit is brought against Commissioner Maynard in his official capacity.

15.      Defendant Eileen O'Brien is a Commissioner of the Massachusetts Gaming Commission.  This suit is brought against Commissioner O'Brien in her official capacity.

16.      Defendant Bradford R. Hill is a Commissioner of the Massachusetts Gaming Commission.  This suit is brought against Commissioner Hill in his official capacity.

17.      Defendant Nakisha Skinner is a Commissioner of the Massachusetts Gaming Commission.  This suit is brought against Commissioner Skinner in her official capacity.

18.      Defendant Paul Brodeur is a Commissioner of the Massachusetts Gaming Commission.  This suit is brought against Commissioner Brodeur in his official capacity.

19.      Defendant Dean Serpa is the Executive Director of the Massachusetts Gaming Commission.  This suit is brought against Executive Director Serpa in his official capacity.  As

Executive Director, Defendant Serpa is responsible for "administering and enforcing the provisions of law relative to the commission."  *See* Mass. Gen. Laws ch. 23K, § 3(i).

20.        Defendants Campbell, Maynard, O'Brien, Hill, Skinner, Brodeur, and Serpa are required by state law to enforce Massachusetts gaming laws.  Mass. Gen. Laws ch. 23N, § 4(g).

## FACTUAL AND LEGAL BACKGROUND

**A.    Event contracts are derivative financial instruments that incorporate real-time information to generate accurate predictions about real-world events.**

21.        This case is about derivatives—financial instruments that derive their value from an underlying asset or event.  Derivatives, the Supreme Court has long recognized, "are of the utmost importance to the business world."  *Bd. of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 248–49 (1905).

22.        One common kind of derivative is a "swap."  Swaps are financial contracts where two parties agree to exchange, or swap, payments with each other based on a pre-agreed formula—say, the price of crude oil, interest rates, or the outcome of a real-world event.

23.        An event contract, in turn, is a swap "whose payoff is based on a specified event or occurrence such as the release of a macroeconomic indicator, a corporate earnings announcement, or the dollar value of damages caused by a hurricane."  CFTC, *Futures Glossary: A Guide to the Language of the Futures Industry*.[2]

24.        Event contracts are usually binary:  One party takes the position that a particular event will occur (the "yes" position), and the other takes the position that the event will not occur (the "no" position).  The terms of the contract specify its payout and expiration date.  For example, the parties might take a position on whether Boston will get more than 3.5 feet of rain (the yearly

---

[2]  https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm  (last visited Feb. 8, 2026).

average) in 2026.  At the end of the year, the party that correctly predicted the outcome is paid the agreed amount by the party that did not.  If 2026 turns out to be an especially wet year and Boston sees 4 feet of rain, the party that took the "yes" position on the weather contract would be paid and the party that took the "no" position would not.

25.    Event contracts have any number of uses.  For example, they can be used to mitigate financial risk.  A hardware store in Boston might purchase an event contract predicting that the city will have a particularly dry year.  If the weather turns out as the owner predicted, the payout from the contract could offset the owner's loss of income from replacement gutters.

26.    Event contracts can have enormous predictive value.  Because they can be purchased and sold at any time before the expiration date, the price will reflect the trader's own expectations about the likelihood of a particular outcome.  Consider a contract that pays out $1 based on whether the Celtics win the Eastern Conference finals.  As traders buy and sell positions on that contract, its price changes to reflect traders' overall perception about the value of that contract.  If traders think the outcome is increasingly likely, demand for "yes" positions will increase and so will the price.  When the outcome seems less likely, the opposite will occur: Demand for "yes" positions will drop, and the price will drop with it.  The result is that the price of the contract will reflect the overall market's view, in real-time, about the probability of the outcome.  And those probabilities are set by trading activity, not fixed odds.

27.    Prediction markets, where event contracts are traded, generate valuable public information about the most important real-world events—finance, weather, news, technology, and sports, to name a few.  Because traders put capital at stake, prediction markets incentivize accurate predictions.  And because prediction markets enable real-time trading on a nationwide basis, they

aggregate diverse perspectives and rapidly incorporate new information. As a result, prediction markets regularly outperform pundits and polls.

28.     When it comes to "sports forecasting," for example, empirical studies show that prediction markets "significantly outperform" the experts. *E.g.*, M. Spann & B. Skiera, *Sports Forecasting: A Comparison of the Forecast Accuracy of Prediction Markets, Betting Odds and Tipsters*, 28 J. Forecasting 55, 65 (2009).[3]

29.     The same is true of elections. Although pollsters initially dismissed Zohran Mamdani as a candidate in the New York Democratic mayoral primary, prediction markets accurately predicted Mamdani's victory.[4]

30.     Event contracts, like other derivatives, provide significant financial value and generate rich information. They allow parties to mitigate risk, although others are equally free to trade; more participants means more liquidity, more efficient trading, and a greater predictive function. Event contracts supply investment opportunities for traders willing to put time and effort into thinking through the likelihood of occurrences in the real world. And, through the collective wisdom of these efficient, transparent markets, event contracts provide precise, real-time information about events that matter to the public at large.

**B.      Over the past century, federal regulation of exchange-traded derivatives became extensive—and exclusive.**

31.     For as long as derivative trading has existed in the United States, however,

_____

[3] https://tinyurl.com/2zm5axpc.

[4] Newsweek, *Zohran Mamdani's Chances of Beating Eric Adams, According to Polls* (June 25, 2025), https://www.newsweek.com/zohran-mamdani-chances-beating-eric-adams-new-york-mayor-odds-polymarket-polls-2090431; Vince Dioquino, *Polymarket Nails NYC Democratic Mayoral Primary Upset, Nears $1B Unicorn Valuation*, Decrypt (June 25, 2025), https://decrypt.co/326892/polymarket-nails-nyc-democratic-mayoral-primary-upset-nears-1b-unicorn-valuation.

individual states have attempted to regulate or prohibit it as unlawful gambling.  "[T]he long history of federal regulation" in this area, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 394 (1982), is a direct result of those "coarse attempts" to manage our increasingly "complex society," *Christie Grain*, 198 U.S. at 247–48.

32.    The federal government first intervened in 1922, requiring futures transactions for grain to be "consummated on an exchange designated as a 'contract market' by the Secretary of Agriculture."  *Merrill Lynch*, 456 U.S. at 360–61.

33.    Congress buttressed this federal scheme a decade later with the CEA, but left the states a role in regulating these kinds of derivatives.  It provided that the federal law would not "impair" the enforcement of "any State law applicable to any transaction" covered by the Act. Pub. L. No.  74-675, § 5, 49 Stat. 1491, 1494 (1936).  States were therefore free to "supplement[] or bolster[] the federal scheme."  *Rice v. Bd. of Trade of City of Chicago*, 331 U.S. 247, 255 (1947).

34.    By the 1970s, exchanges had become too important to the national economy to permit "[v]aried and often conflicting" state laws to interfere with national exchanges subject to federal control.  119 Cong. Rec. 41333 (1973).  So Congress created the CFTC and enacted "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch*, 456 U.S. at 356.

35.    Congress provided that the CFTC would regulate "all" commodity futures. Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (1974).  And Congress granted the CFTC "*exclusive jurisdiction* with respect to accounts, agreements . . . and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated" under the CEA.  *Id*. (emphasis added).

36.     Courts immediately recognized "that state regulatory agencies [were] preempted by the 'exclusive jurisdiction' of the CFTC" from encroaching on the CFTC's federal authority.  *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *accord, e.g.*, *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980); *Westlake v. Abrams*, 504 F. Supp. 337, 343–44 (N.D. Ga. 1980); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

37.     Massachusetts officials took note, too.  In a Congressional hearing about the effects of the 1974 amendments to the CEA, the Massachusetts Secretary of State demanded that Congress "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud."  *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th Cong. 379 (1978).

38.     Following the 2008 financial crisis, Congress again changed the regulatory landscape.  The Dodd-Frank Act of 2010 innovated and expanded CFTC authority in two ways most relevant here.

39.     *First*, the Act added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction.  As a result, the CFTC now exercises "exclusive jurisdiction . . . with respect to accounts, agreements[,] . . . and transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A).

40.     Event contracts are covered by the Act because payment for event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii) (defining "swap").

41.     *Second*, the Act introduced what is known as the "Special Rule," which supplies the CFTC the discretion—but not the obligation—to prohibit the trading of "[e]vent contracts" involving certain subjects, including "terrorism," "assassination," "war," and "gaming," if it determines that they are "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C).

42.     The CEA grants the CFTC "exclusive jurisdiction" to regulate exchange-traded event contracts, to determine whether they involve "gaming," and to prohibit them based on the CFTC's view of the public interest.  7 U.S.C. §§ 2(a)(1)(A), 7a-2(c)(5)(C).

**C.     The CEA sets forth the comprehensive regulatory framework for event contracts.**

43.     The CFTC exercises its exclusive jurisdiction through a comprehensive regulatory framework.  Certain derivatives trading in the United States must take place on a board of trade that the CFTC has designated as a contract market.  7 U.S.C. §§ 2(e), 6(a)(1), 7(a).  That designation reflects a rigorous federal determination that the contract market satisfies extensive requirements governing market integrity, transparency, financial safeguards, and customer protection.

44.     The CFTC-designation process is a demanding one because contract markets are charged with a broad array of functions that the CFTC itself would otherwise have to perform. To obtain approval to operate a designated contract market, an entity must demonstrate to the CFTC that it complies with the CEA's 23 "core principles."  17 C.F.R. § 38.3(a)(2); *see* 7 U.S.C. §§ 7(d), 8(a).  Core principle 1 requires the contract market to comply with *all* CFTC regulations. *See* 17 C.F.R. § 38.100(a)(2).  And core principle 2 requires that the entity be "transparent" in its criteria for accessing the market, *id.* § 38.151(b)(1), prohibit abusive, "manipulative[,] or disruptive trading practices," *id.* § 38.152, "maintain an automated trade surveillance system capable of detecting and investigating potential trade practice violations" based on "specific trade execution patterns and trade anomalies," *id.* § 38.156, and "conduct real-time market monitoring

11

of all trading activity on its electronic trading platform(s) to identify disorderly trading and any market or system anomalies," *id.* § 38.157.

45.     The remaining core principles provide further protection against contract manipulation, ensure that risk controls are in place to limit market disruptions, and require daily publication of the price and volume of actively traded contracts. *See* 17 C.F.R. §§ 38.200–38.301; 7 U.S.C. § 7(d)(8). For example, a designated contract market must "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market" and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A). And those rules must provide "impartial access to its markets and services" using "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). In short, to obtain designation as a contract market, applicants must show that they can be trusted to establish, monitor, and enforce rules for the markets they operate.

46.     Designated contract markets may not list new kinds of contracts on their exchanges without first submitting the contract for CFTC approval or certifying that the contract complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1). The most common method of certification is known as self-certification. Before listing a new contract, the designated contract market must supply the CFTC with a "certification . . . that the product to be listed complies with the [CEA]" and CFTC regulations, as well as "[a] concise explanation and analysis"—with accompanying documentation—"with respect to the product's terms and conditions" and "the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations," among other things. 17 C.F.R. § 40.2(a); *see* 7 U.S.C. § 7a-2(c)(1).

47.     Self-certification is permissible only because "self-regulatory organizations such as contract markets possess a form of delegated" government authority, *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 625 (7th Cir. 2022), a privilege earned only after demonstrating the extensive regulatory compliance necessary to receive CFTC designation. And the CFTC retains authority to investigate, stay, or amend the contract even after it has been listed. 17 C.F.R. § 40.2(c).

48.     More broadly, the CFTC wields considerable tools for enforcing the CEA and its regulations. For example, the CEA empowers the agency to subpoena testimony and documents, 7 U.S.C. § 9(5), bring administrative enforcement actions, *id.* §§ 9(4), 13b, and sue in federal court for injunctive relief, monetary penalties, the appointment of receivers, disgorgement, restitution, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

**D.     The CFTC licenses Polymarket US as a designated contract market subject to federal law and the CFTC's exclusive jurisdiction.**

49.     The CFTC granted Polymarket US its designation as a contract market on July 9, 2025, finding that the platform now doing business as Polymarket US could and would comply with the CEA and the CFTC's regulations. Order of Designation, *In re Application of QCX LLC for Designation as a Contract Market*, Commodity Futures Trading Comm'n (July 9, 2025).

50.     Today, Polymarket US specializes in contracts concerning real-world events that matter to the public. On September 30, 2025, December 10, 2025, and February 4, 2026, Polymarket US self-certified various financial, election-related, and sports-related event contracts.

*See* 7 U.S.C. § 7a-2(c); CFTC, Designated Contract Market Products[5] (listing self-certifications for contracts).

51.    These event contracts fall within the heart of the CFTC's exclusive jurisdiction. Payment on one of Polymarket US's listed event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

52.    One example is event contracts based on the winner of the Super Bowl. The Super Bowl's "associat[ion] with a potential financial, economic, or commercial consequence" is obvious. 7 U.S.C. § 1a(47)(A)(ii). To mention just a few examples:

    a.    Winning the Super Bowl causes a team's valuation to surge, retailers' sales of merchandise of that team to skyrocket, and hometown sales to spike. In 2025, for example, the Eagles took in over $1 billion in revenue from their 2025 win, with Philadelphia restaurants, retailers, and hotels also able to capitalize off the team's success.[6]

    b.    Retailers regularly tie promotions to game results, including the identity of the winning team, final score, and game duration.[7]

---

[5] https://tinyurl.com/yamausyk.

[6] *See, e.g.*, Rachel Moore, *Eagles to generate $1.2B Economic Impact with Super Bowl Parade Season*, PHL17 (Feb. 13, 2025), https://phl17.com/phl17-news/eagles-to-generate-1-2b-econ omic-impact-with-super-bowl-parade-season/ (last visited Feb. 8, 2026); Jensen Toussaint, *Philadelphia Eagles Valuation Likely to Skyrocket After Second Super Bowl Win*, Philadelphia.Today (Feb. 15, 2025), https://philadelphia.today/2025/02/philadelphia-eagles-valuation-to-rise/ (last visited Feb. 8, 2026).

[7] *See, e.g.*, *Buffalo Wild Wings (@bwwings),* Instagram (Feb. 8, 2026), https://www.instagram. com/p/DUgIPoekVo8/ (promising free wings if Super Bowl goes to overtime); *Boston College, Los Amigos Taco Time,* https://bceagles.com/sports/2023/4/14/in-game-promotions (last visited Feb. 8, 2026) (awarding fans a free taco every time the Boston College Men's Basketball Team scores 70 points); *Boston Celtics, Miss for McDonald's,* https://www.nba.com/celtics/promo tions/mcdonalds/miss-for-mcdonalds (last visited Feb. 8, 2026) (awarding free fries whenever a

53.    Sports-related event contracts are not the same as sportsbooks.  The financial products and regulatory regimes differ in fundamental ways.

54.    Event-contract prices are formed by matching buyers and sellers among diverse market participants on these national exchanges.  Sports betting, by contrast, is conducted through local sportsbooks—regulated at the state level—with each sportsbook independently setting the terms of its wagers.  The incentives in sports betting and derivatives markets are different.  Sportsbooks set odds based on proprietary information; event contracts are priced by supply and demand in a relevant market—*i.e.*, buying and selling activity reflecting the diverse perspectives of millions of individual traders on a given event.  And sports bettors typically place wagers against the "house," so sports bettors and sportsbooks are counterparties to the gambling transaction.  But Polymarket US does not operate as a counterparty in the derivatives market.  Instead, it operates as a transparent, centralized exchange matching orders of third parties.  Polymarket US makes money by charging a flat fee for each transaction; unlike a sportsbook, it does not make money when a bettor loses, and it makes the same amount regardless of the outcome of a particular event.

55.    Federal law governs event contracts of all kinds—including sports-related ones—traded on designated contract markets.  That is, all derivative instruments listed on centralized exchanges operate pursuant to extensive federal product certification, registration, and approval procedures.  Sports-event contracts, like any other "transactions subject to" the CEA, "are entered into regularly in interstate . . . commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or

---

visiting team misses at least one free throw during the fourth quarter of a Boston Celtics game); *Little Caesars, Little Caesars Road to the Super Bowl Sweepstakes,* https://mobilestatic.littlecaesars.com/documents/Little%20Caesars%20-%20NFL%20Super%20Bowl%202026%20Sweepstakes.pdf (last visited Feb. 8, 2026) (conditioning chance to win free Super Bowl ticket on predicting how a customer's favorite team will perform).

disseminating pricing information."  7 U.S.C. § 5(a).  They are therefore traded on a national exchange and regulated on the national level to ensure "trading in liquid, fair and financially secure trading facilities."  *Id.*

56.     In contrast, sportsbooks operate under the auspices of state law.  And because sports gambling is regulated on a state-by-state basis, sportsbooks tend to be local operations governed by local laws.  *See Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1302 (3d Cir. 1996).

**E.     The Massachusetts Gaming Commission sues another prediction market, without warning, for offering federally regulated sports-event contracts.**

57.     On September 12, 2025, Massachusetts sued another CFTC-designated contract market in state court—without sending a cease-and-desist letter or giving any notice or warning. The Commonwealth alleged that, by making sports-event contracts available for trade in Massachusetts, the contract market was "offering sports wagering without a license in violation of Mass. Gen. Laws ch. 23N, § 5 et seq."  Complaint ¶ 1, *Commonwealth of Massachusetts v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Sep. 12, 2025), Dkt. 1.

58.     Relying on that theory, Massachusetts sought a preliminary injunction enjoining the contract market from "engaging in any activity in connection with sports wagering in the Commonwealth of Massachusetts" "until further order of the Court."  *Id.*, Dkt. 4, Ex. A at 1–2.

59.     On February 6, 2026, the court granted that motion and enjoined the designated contract market from "[o]ffering, listing, matching, executing, settling, or otherwise facilitating any contract" on "sporting events" to "any person located in Massachusetts."  *Id.*, Dkt. 57, at 1–2.

60.     Given the Commonwealth's enforcement action against a similarly situated contract market, Polymarket US faces the imminent threat of enforcement by Massachusetts. Similarly, Polymarket US does not have a Massachusetts sports-wagering license—because

Massachusetts may not lawfully require Polymarket US to obtain one as a condition of offering event contracts to Massachusetts users. And, similarly, although Polymarket US runs its event contract market in accordance with—and subject to the exclusive jurisdiction of—federal law, the Commission has taken the position that these activities are within the purview of state law.

61.     There is a real and imminent risk of civil and criminal penalties. Massachusetts's current litigating position is that prediction markets offering sports contracts in the Commonwealth violate laws providing for "a civil penalty not to exceed $2,000 for each violation or $5,000 for violations arising from the same series of events," as well as imprisonment and escalating criminal fines. Mass. Gen. Laws ch. 23N, § 21.

62.     Given the emergency injunctive relief Massachusetts sought without warning— and obtained last week—against a similarly situated federally licensed designated contract market, the threat of enforcement against Polymarket US is real, imminent, and concrete, presenting a live and justiciable controversy. Polymarket US is thus forced to choose between protecting its rights under federal law and exposure to imminent state enforcement, rendering this action ripe for adjudication and appropriate for injunctive relief now, not after irreparable harm has occurred.

**F.     Looming enforcement of preempted Massachusetts law irreparably harms Polymarket US.**

63.     The business consequences for Polymarket US arising from Massachusetts's near-certain enforcement require this Court's immediate action. An enforcement action by Massachusetts—even a meritless one—would raise a red flag for Polymarket US's business partners, triggering notification and termination clauses in many of Polymarket US's agreements, and jeopardizing key partnerships crucial to the company's growth. Additionally, Polymarket US would lose out on potential business partners who would steer clear of a company under a cloud of enforcement proceedings.

64. The alternative—abruptly terminating Massachusetts users' access to event contracts and unwinding their current positions—is just as damaging. Polymarket US has expended tremendous resources to garner customer goodwill and a solid reputation. Cutting off Bay Staters from its event contracts—contracts that are available to users outside Massachusetts—would deal a decisive blow to Polymarket US's goodwill and reputation within the state. It would disrupt overall liquidity and impair the information that trading generates by forcing Massachusetts residents off the exchange. And it would create confusion among users about what shutting off their access to the market means for their trading positions. Unwinding existing contracts, in particular, would confuse and frustrate both Bay Staters and users on the other side of the contracts.

65. Further, reduced liquidity would deter customers from using the platform. Price discovery and market efficiency are two main reasons why event contracts have predictive value (and thus why Polymarket US is attractive to users). Reducing liquidity dampens both, which are necessary elements of prediction markets' functions, so termination of Massachusetts-based trading hinders the orderly functioning of markets nationwide and could deter customers outside Massachusetts from using the platform at all, imposing substantial burdens on interstate commerce.

66. Additionally, because Polymarket US is not a counterparty to its users' event contracts and does not hold its traders' funds, compliance with Massachusetts's demands would require the company pay money it has not received—sums Polymarket US could not recover from Massachusetts, which is immune from damages liability, even if Polymarket US ultimately prevails in litigation. The financial harms from forgoing business in Massachusetts would similarly be irrecoverable.

67.     All told, "the prospect of" an imminent enforcement action irreparably harms Polymarket US by putting it to an impossible choice: continue operations "and expose [itself] to potentially huge liability," on the one hand; or "suffer the injury of obeying the [preempted] law," on the other.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  There is therefore "no adequate remedy at law."  *Id.*

## COUNT I

### (Commodity Exchange Act Preemption)

68.     Polymarket US incorporates the preceding paragraphs by reference.

69.     The Supremacy Clause of the United States Constitution enshrines the "Laws of the United States" as "the supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding."  U.S. Const. VI, cl. 2.

70.     "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield."  *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (quotation marks omitted).

71.     "Federal law preempts state law (1) when Congress has expressly so provided, (2) when Congress intends federal law to 'occupy the field' and (3) to the extent that state law conflicts with any federal statute."  *Am. Steel Erectors, Inc. v. Local Union No. 7*, 536 F.3d 68, 84 (1st Cir. 2008).

72.     The CEA bars Massachusetts from purporting to regulate Polymarket US's federally regulated offering of event contracts under each form of preemption.

**A.     Express preemption bars Massachusetts regulation of Polymarket US's exchange.**

73.     Congress expressly preempted state regulation of event-contracts trading on designated contract markets.

74.     Under the CEA's express terms, the CFTC, not the Massachusetts Gaming Commission, has "exclusive jurisdiction" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A); *see Precious Metals Assocs., Inc. v. CFTC*, 620 F.2d 900, 905 (1st Cir. 1980) (discussing pre-Dodd-Frank version of the Act).

75.     Confirming as much, the very next sentence explains that the section does not "supersede or limit the jurisdiction" of "regulatory authorities under the laws of the United States or of any State," "*[e]xcept as hereinabove provided*."  7 U.S.C. § 2(a)(1)(A) (emphasis added).

76.     The CFTC's "exclusive jurisdiction" over federally regulated event-contract exchanges, 7 U.S.C. § 2(a)(1)(A), therefore preempts Massachusetts's supposed jurisdiction to police those exchanges, *see* Complaint, *Commonwealth of Massachusetts v. KalshiEX LLC*, No. 2584CV02525 (Mass. Super. Ct., Suffolk Cnty. Sep. 12, 2025), Dkt. 1.  *See Leist*, 638 F.2d at 322 ("[T]he courts have held that [§] 2(a)(1) of the CEA preempts the application of state law."); *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 563 (6th Cir. 2002) (it is "manifestly clear" that a statutory grant of "exclusive jurisdiction" "preempt[s] . . . state statutes").

77.     Take, for example, Massachusetts law's definition of "wager," which is "a sum of money or thing of value risked on an uncertain occurrence."  Mass. Gen. Laws ch. 23N, § 3.

78.     This definition echoes the CEA's definition of a swap, which includes "any . . . transaction that provides for any . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial . . . consequence."  7 U.S.C. § 1a(47)(A)(ii).  When a transaction qualifies as a

swap within the meaning of the CEA, the CFTC, not Massachusetts, has "exclusive jurisdiction." *Id.* § 2(a)(1)(A).

79.     Massachusetts says that sports-event contracts are gambling.  That is not true. *See supra* ¶¶ 51–56.  Moreover, the CEA's Special Rule anticipates that certain "event contracts" will "involve . . . gaming" and authorizes the CFTC to ban the trading of those contracts.  7 U.S.C. § 7a-2(c)(5)(C).  Thus, even if sports-event contracts *were* a form of gaming (they are not), they would remain within the CFTC's exclusive jurisdiction and beyond the State's regulatory reach.

## B.     Implied field preemption bars Massachusetts regulation of Polymarket US's exchange.

80.     Through the CEA, "Congress intended the CFTC to occupy the entire field of commodities futures regulation." *Brien*, 617 F.2d at 310.

81.     Congress enacted the Commodity Futures Trading Commission Act of 1974 "to provide uniform regulation of all commodity futures trading."  *Singer v. Dean Witter Reynolds Inc.*, 614 F. Supp. 1141, 1145 (D. Mass. 1985).  Congress achieved its goal of "preempt[ing] the field insofar as futures regulation is concerned" through the "grant[ of] exclusive jurisdiction to the Commodity Future[s] Trading Commission," together with the "pervasive regulatory scheme established under the Commodity Exchange Act," as amended.  *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 1982 WL 1348, at *2 (S.D.N.Y. Nov. 10, 1982); *supra* ¶¶ 31–37.

82.     The field occupied by federal law expanded when the Dodd-Frank Act "amended the [CEA] to 'establish a comprehensive new regulatory framework for swaps,' and vested the [CFTC] with exclusive jurisdiction to implement that framework."  *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 445 (S.D.N.Y. 2017) (footnote omitted) (quoting 78 Fed. Reg. 33,476, 33,477 (June 4, 2013)); *see supra* ¶¶ 37–42.

83.     There is no room for state interference with this "comprehensive federal" scheme.  *Singer*, 614 F. Supp. at 1145.  Enforcement of Massachusetts gaming laws and corresponding criminal laws against Polymarket US would impermissibly intrude on the CFTC's exclusive authority to police trading on CFTC-regulated exchanges.  *See*, *e.g.*, *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) ("at the very least[,] field preemption applies" to "sports-related event contracts" on a designated contract market).

**C.     Conflict preemption bars Massachusetts regulation of Polymarket US's exchange.**

84.     Conflict preemption also prevents enforcement of these Massachusetts laws against Polymarket US because those laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (quotation marks omitted).

85.     Consider the Commonwealth's position that federally regulated sports-event contracts are against the public interest.  That is not Massachusetts's decision to make:  The CEA grants the *CFTC* the authority to "determine[]" whether such contracts "involve . . . gaming" and, if so, whether they should be prohibited as "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i)(V).

86.     The CFTC has not, however, invoked this Special Rule to prohibit Polymarket US from listing sports-event contracts.  Therefore, Polymarket US's sports-related event contracts evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them.  Because the "application of state law" would countermand that decision and "directly affect trading on or the operation of [the] market, it would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, and hence is preempted." *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 2002 WL 31356362, at *5 (S.D.N.Y.

Oct. 17, 2002) (quotation marks omitted); *see also Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 805 F.3d 322, 343 (1st Cir. 2015), *aff'd sub nom. Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115 (2016).

87.    More broadly, if Massachusetts attempts to ban Polymarket US's event contracts that federal law and the CFTC have authorized, the Commonwealth's actions would frustrate the CFTC's exclusive authority to regulate its designated exchanges.  As this Court has recognized, the purpose of the 1974 amendments to the CEA was "to provide uniform regulation of all commodity futures trading."  *Singer*, 614 F. Supp. at 1145; *cf.* 15 U.S.C. § 8325(a) (directing the CFTC to achieve "consistent *global* regulation of swaps" (emphasis added)).  Permitting a Massachusetts enforcement action against Polymarket US would conflict with Congress' goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes—a conflict that becomes clearer still when one considers that nothing would stop the 49 other States and the District of Columbia from equally attempting to subject Polymarket US's exchange to their own, varying laws.

88.    In short, Massachusetts may not enforce against Polymarket US state laws that federal law preempts.

## PRAYER FOR RELIEF

An actual controversy has arisen between the parties entitling Plaintiff to legal, declaratory, and injunctive relief.

WHEREFORE, Plaintiff Polymarket US respectfully requests that this Court enter the following relief:

A.      A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the

Federal Rules of Civil Procedure, that Massachusetts gaming laws are preempted under the CEA

as applied to Plaintiff.

B.      Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal

Rules of Civil Procedure, enjoining Defendants from taking any steps to enforce Massachusetts

gaming laws against Plaintiff.

C.      Any other relief within this Court's discretion that it deems just and proper.


Dated:  February 9, 2026                          Respectfully submitted,

                                                   QCX LLC d/b/a POLYMARKET US

                                                   By its attorneys,

                                                   */s/ Elissa Flynn-Poppey*

Orin Snyder*                                       Elissa Flynn-Poppey, BBO #647189
osnyder@gibsondunn.com                             EFlynn-Poppey@mintz.com
Matt Benjamin*                                     Emily Kanstroom Musgrave, BBO #678979
mbenjamin@gibsondunn.com                           EKMusgrave@mintz.com
GIBSON DUNN & CRUTCHER LLP                         Mitchell J. Clough, BBO #705227
200 Park Avenue                                    MJClough@mintz.com
New York, NY 10166                                 MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
Telephone: 212.351.4000                              AND POPEO, P.C.
                                                   One Financial Center
Thomas H. Dupree, Jr.*                             Boston, MA 02111
tdupree@gibsondunn.com                             Telephone: 617.542.6000
Jacob T. Spencer*
jspencer@gibsondunn.com
Adam I. Steene*
asteene@gibsondunn.com
GIBSON DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500

* *pro hac vice* applications forthcoming


          *Attorneys for Plaintiff QCX LLC, d/b/a Polymarket US*